GARY M. RESTAINO
United States Attorney
District of Arizona
HEATHER SIEGELE
JARED KREAMER HOPE
Assistant U.S. Attorneys
United States Courthouse
405 W. Congress Street, Suite 4800
Tucson, Arizona 85701
Telephone: 520-620-7300
Email: heather.siegele@usdoj.gov
jared.kreamer.hope@usdoj.gov
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | CR-22-00376-JCH-JR |
| Plaintiff, | GOVERNMENT'S SENTENCING MEMORANDUM |
| vs. | |
| Jesus Ernesto Dessens-Romero, | |
| Defendant. | |

The United States of America, by and through its undersigned attorneys, files this sentencing memorandum.

**I. FACTS:**

The defendant was convicted of being a foot guide for the victim, Ariacne Lopez-Cortez, along with the other members of her group, Yaneira Lopez-Cortez, Maria Lopez-Cortez, and Victor Torres-Hernandez. After Ariacne died in his care, he continued smuggling, acting as a load driver himself and recruiting other load drivers. He was eventually apprehended in Tennessee while transporting two aliens for financial gain. The defendant's conduct as a foot guide was charged in Counts 1-9, and his additional conduct once in the United States was charged in Counts 10-12.

The jury returned guilty verdicts on all counts. On Counts 1 and 2, the jury found the defendant committed the offenses for profit and placed the life of any person in jeopardy but did not find beyond a reasonable doubt that the defendant was the proximate

cause of Ariacne's death.  On Counts 3-12, the jury found the offense(s) were committed for profit.

Trial testimony on Counts 1-9 revealed the defendant first met Ariacne, Yaneira, Maria, and Victor Manuel (the group) at a staging area near San Pedro in Mexico in February of 2021.  The defendant then guided the group into the United States and into the Huachuca Mountains.  He took them on an arduous three-to-four-day route through the mountains, where they had to crawl up the mountainside at times and slide down at other times.  Law enforcement officers also testified to how difficult and challenging the terrain is in the Huachuca Mountains.

The temperature and weather added to the difficulty, snowing on the group at night. On the second day of the journey, Ariacne began to struggle to walk. She had had an injury as a young child and subsequently had difficulty with her right knee and hip such that she always walked with a limp. In addition to the pain in her leg, she also developed stomach pain. On the second night, she became extremely sick and began vomiting and hallucinating.  She was in significant medical distress.

On the third day, Ariacne was unable to walk and the group's efforts to carry her were unsuccessful.  The group was at a location the defendant told them was near a military base and well-traveled, and he promised them he would return for Ariacne after he dropped off the rest of the group, if needed.  The group decided to continue with the defendant, and Ariacne was left behind, still in significant medical distress.  The defendant did not call 911; instead, he hiked to higher ground to call his bosses in the smuggling organization. The defendant briefly left the group to go back to Ariacne, but he returned about a half hour later, saying he could not carry her.  When he returned, the defendant had the water bottle that the group had left with Ariacne.

The defendant led the group on to be picked up by a load driver near Sierra Vista. He and his brother-in-law were let out at a McDonald's in Sierra Vista rather than having to go to the Phoenix stash houses with the rest of the group.  Yaneira contacted her father, Miguel Lopez-Munoz, who in turn contacted law enforcement to try to locate Ariacne.

Yaneira then called the defendant to let him know that Ariacne had not been found and was still missing in the mountains. The defendant told Yaneira that it was too late to go back that night but that he would return for Ariacne the next morning if she had not been found. He did not do so.

In March, the defendant reached out to the sisters via WhatsApp and asked the family to take down the missing person Facebook posts, saying the cartel was giving him trouble about it. Yaneira said she would arrange to have the posts taken down so long as the defendant would go back out and look for Ariacne. She reminded him he had promised to do so before but had not. The defendant again promised to go out and look for Ariacne, but only if the posts were taken down. He still did not do so.

Despite significant efforts by Ariacne's family and by law enforcement, they could not locate Ariacne. Over the ensuing months, law enforcement continued to search for her, including coordinating with the non-profit group Busqueda Y Rescate. In November 2021, Busqueda Y Rescate found Ariacne's remains in the Huachuca Mountains.

While law enforcement searched for Ariacne, the defendant continued to smuggle aliens. His conduct once inside the United States, from April to June, was charged in Counts 10-12. The government introduced thousands of text and voice messages the defendant sent and received via WhatsApp regarding various smuggling events. A number of these messages involved events in which the defendant himself acted as a load driver picking up aliens near Douglas, Arizona. In other messages, the defendant recruited load drivers for alien smuggling events. The defendant also negotiated selling a gun to "Jose." Jose told the defendant that he intended to use the gun during a smuggling pickup to "kill anyone causing trouble." Finally, the messages identified Alex Luna-Salazar and Fermin Salazar-Barcenas as people to be smuggled. The defendant was arrested in Tennessee while transporting these two people on June 30, 2021. During this event, he possessed personal use amounts of cocaine.

## II. GUIDELINE CALCULATIONS:

The government concurs with the conclusions in the draft presentence report (PSR)

that the base offense level is 12, the listed enhancements apply, and the total offense level is 37. This offense level creates a guideline range of 235-240, based on the 20-year statutory sentencing cap.

### III. SENTENCING DETERMINATION UNDER 18 U.S.C. 3553(a)

The Court must correctly calculate the advisory guideline range. However, the Court is not bound by either the upper or lower limit of that range. The statutory maximums and minimums dictate the defendant's sentencing range and are as follows:

- Counts 1 and 2: 0 to 20 years
- Counts 3-5 and 10-12: 0 to 10 years
- Counts 6 and 7: 3 to 10 years (first and second violations of 1324(a)(2)(B)(ii))
- Counts 8 and 9: 5 to 15 years (third and more violations of 1324(a)(2)(B)(ii))

While the Court could run certain counts consecutively, the government is not requesting consecutive sentences in this case. Therefore, the minimum sentence the Court may impose is 5 years and the maximum sentence the Court may impose is 20 years.

When determining a sentence within this 5-to-20-year range, the Court shall impose a sentence sufficient, but not greater than necessary, to meet the goals of sentencing. 18 U.S.C. § 3553(a). Some of the aggravating factors present in this case have already been found and included through offense enhancements to the advisory guideline range:

- At least 25 to 99 aliens smuggled, 2L1.1(b)(2)(B)
- Unaccompanied minor smuggled, 2L1.1(b)(4)
- Substantial risk of death or serious bodily injury, 2L1.1(b)(6)
- Death of a person, 2L1.1(b)(7)(D)

In addition, the following aggravating factors are also relevant to the Court's determination of what sentence to impose within the range of 5 to 20 years.

### A. Additional Aggravating Factors not Contemplated in the Advisory Guideline Range:

#### 1. The Use of Firearms by Co-Conspirators is an Aggravating Factor:

The defendant's co-conspirators attempted to or did possess firearms during alien

smuggling events related to the offense of conviction.

First, during the February 2021, when the defendant smuggled the victim's group into the United States, other members of the smuggling organization possessed weapons. During an interview with Homeland Security Investigations (HSI), material witness Victor Manuel Torres-Hernandez said that members of the smuggling organization possessed guns at staging locations in Mexico. *See* Government's Attachment A: Excerpt of Victor's interview. Early in the interview, he talked about a higher-level boss who had a bodyguard. *Id., Bates page 2452, at boxes 153-155.* Toward the end of the interview, agents asked if the bodyguards were armed. Victor responded "Yes, a gun. Each had a gun." *Id. at Bates page 2493, at box 552.* He explained further: "…the day they took us to the mountains….He told us, the man I'm telling you about, the one who was the boss of the coyotes - He arrived and he said I will come at such and such hour to get you. And he did arrive in a very ugly truck. And they arrived too and yes, each of them came with their AK's." *Id. at Bates page 2494, at boxes 565-569.*

The government did not elicit this testimony at trial since the firearm was not possessed by the defendant specifically and could have been considered more prejudicial than probative regarding any fact in dispute at the trial. However, the Court may consider this information for sentencing purposes.

Second, during the April to June 2021 smuggling conspiracy, the defendant acted as a go-between for "Jose" to purchase a gun for use during smuggling events. They discussed the acquisition of the gun via WhatsApp.

WhatsApp chat with Jose:
- Box 490: defendant asks Jose "What's up, are you still interested in a gun?"
- Box 492: Jose tells the defendant yes and that he needs to take the gun "because when I go pick up, I will need to take the gun to kill anyone causing trouble, fuck it." In context of the larger chat, picking up refers to illegal aliens.
- Box 495: Jose tells the defendant to tell a third party "450 and the gun."
- Box 500: defendant asks if Jose is going "to want the gun so I can tell the dude."

- Box 505: defendant tells Jose that "for 500 the least it's a 380." Referring to price and caliber.

*See* Government's Attachment B: Excerpt of defendant's chat with Jose.

These two separate instances show the danger and potential for violence posed by the smuggling organizations in which the defendant voluntarily participated. It also demonstrates that Ariacne's death did not deter the defendant from involvement in the dangerous aspects of smuggling. Notably, the defendant continued to negotiate a gun sale to Jose after Jose told him he intended to use the gun to kill anyone causing trouble.

### 2. The Defendant's Attempts to Convince the Lopez-Cortez Family to Remove Missing Person Post is an Aggravating Factor:

Next, the defendant actively worked on behalf of smugglers to get Ariacne's family to remove social media missing persons posts they were using to try to find her. (Doc. 147-1.) In exchange for the family removing the posts, the defendant promised Yaneira that he would return to the Huachuca Mountains to look for Ariacne. He did not do so. The defendant worked to further the smuggling organization's interests and his own interest in getting the missing persons posts taken down despite the potential negative impact on the efforts to find Ariacne or her remains. This conduct may not exactly fit an obstruction of justice guideline enhancement, but it is significant offense conduct that the Court should consider when determining a sentence within the statutory sentencing range.

### B. The Victim's Death has Significantly Impacted her Loved Ones.

Ariacne Lopez-Cortez was a daughter, sister, wife, and young mother. The members of her family will separately present their input to the Court, but the defendant's actions have had a dramatic effect on their lives.

Miguel and Maria have lost their eldest daughter. Miguel testified about his daughter at trial, and his grief, two and a half years later, was evident. Yaneira and Lupita loved their sister and are also dealing with grief and loss. Theirs is complicated by the regret that they believed the defendant when he said Ariacne would be safe in the location where she was left and that, if needed, he would return and get her help once he led the rest

of the group out of the mountains.

Ari's husband raises their daughter without her mother. Attachment C is one of the last photos Ariacne took with her daughter, Emily.[1] When the defendant chose to avoid the risk of being apprehended himself and did nothing to get Ariacne medical assistance, Emily lost her mother.

Ariacne's phone was found close to her remains, and the phone extraction contained the last messages between her and her husband. (Doc. 82-1.) The messages were poignant and, in retrospect, heartbreaking. Ari's husband told her to be strong, take care, and that he was waiting for her. Ari told him to pray for them to do well and that she would see him over there (in the United States). They both told each other repeatedly that they missed each other and that they loved each other.

It is impossible to overstate the impact of Ari's death on the lives of her family and daughter.

**IV. <u>SENTENCING RECOMMENDATION:</u>**

The government recommends a sentence of 240 months in prison followed by supervised release. This sentence is within the guideline range for the offense and is appropriate for the offense and the defendant's conduct.

The defendant willingly associated himself with a criminal organization, first, as a foot guide, later as a driver and recruiter and organizer. The defendant guided the victim's group on a route he knew to be difficult. When Ariacne began to have difficulty, he continued to lead them on. When Ariacne was in severe medical distress, the defendant had the ability to save her life and chose not to. When he could have called 911 to save her, he instead called his bosses in Mexico. He told Yaneira that the southside smugglers told him to call 911, but he did not, he simply left Ariacne where she died.

Over the ensuing months, the defendant continued his work for the smuggling

---

[1] Included with permission of the family.

organization. Despite knowledge Ariacne was missing, he made no effort to find her or lead emergency services to her. He made promises to Yaneira that he would do those things, but the promises were not genuine. Instead, they were calculated to convince the family to take down the missing persons posts.

After Ariacne died in his care, the defendant showed no remorse or concern about continuing to engage in human smuggling. In his subsequent actions, he simply accelerated his smuggling activities. The Court is familiar with the thousands of messages the defendant sent and received regarding various smuggling activities between April and June of 2021. These actions are also concerning relative to dangerousness, as demonstrated by the gun conversation with Jose.

The defendant's actions as a foot guide show a disregard for the importance of human life. His further actions in smuggling simply confirm that fact. At all times, when he had the choice between protecting life and choosing to engage in a criminal enterprise, he chose the criminal enterprise. His criminal conduct only stopped when he was apprehended in Tennessee while transporting two aliens.

A sentence of 240 months reflects the seriousness of the offenses, the impact on the victim's family, and the lack of any appreciable remorse or change in the defendant's behavior.

Respectfully submitted this 20th day of June, 2024.

GARY M. RESTAINO
United States Attorney
District of Arizona

*s/Jared Kreamer Hope*
*s/Heather Siegele*

JARED KREAMER HOPE
HEATHER SIEGELE
Assistant U.S. Attorneys

Copy of the foregoing served electronically or by
other means this 20th day of June, 2024, to:

All ECF Participants