**The Carrillo Law Firm, PLLC**
F. Michael Carrillo, SB#024343
23 North Stewart Avenue
Tucson, Arizona 85716
Phone: (520) 820-2829
Email: *thecarrillolawfirm@gmail.com*

ISABEL MICHELA AMSEL
110 S. Church #436
Tucson, Arizona 85701
ISABEL MICHELA AMSEL (Az Bar No: 023945)
Email: *isabelamsel@outlook.com*
Telephone: (520) 400-0721

*Attorneys for Jesus Ernesto Dessens-Romero*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | NO: CR-22-00376-TUC-JCH-JR-1 |
| Plaintiff, | |
| v. | **DEFENDANT'S SENTENCING MEMORANDUM & REQUEST FOR A VARIANCE** |
| Jesus Ernesto Dessens-Romero, | |
| Defendant. | |

The defendant, Jesus Ernesto Dessens-Romero, through counsel, respectfully presents to the Honorable Court the following Sentencing Memorandum. Based on the factors set forth in this memorandum and those contained in 18 U.S.C. § 3553(a), the defense respectfully requests that the Court grant Jesus Ernesto Dessens-Romero's request for a variance and impose a sentence of five years in custody (sixty months) followed by a term of supervision.

Respectfully submitted this 26th day of June 2024.


THE CARRILLO LAW FIRM, PLLC
F. MICHAEL CARRILLO

1

*s/ F. Michael Carrillo*
F. Michael Carrillo
*Attorney for Jesus Ernesto Dessens-Romero*

ISABEL MICHELA AMSEL

*s. Isabel M. Amsel*
Isabel A. Amsel
*Attorney for Jesus Ernesto Dessens-Romero*

**Sentencing Factors Contained in 18 U.S.C. § 3553(a)**

In *United States v. Booker*, 125 S. Ct. 738 (2005), the Supreme Court found mandatory enforcement of the United States sentencing guidelines to be unconstitutional however the Court preserved the guideline sentencing scheme by severing those provisions of the Sentencing Reform Act that made the guidelines mandatory. Consequently, the guidelines are now "effectively advisory." *Booker,* 125 S.Ct. at 757; *United States v. Ameline* [*Ameline III*], 409 F.3d 1073, 1077 (9th Cir. 2005). As modified, sentencing courts are to consider guidelines ranges but are permitted to tailor sentences in light of other statutory concerns. See 18 U.S.C. § 3553(a); *Booker*, 125 S.Ct. at 757-69. In other words, sentencing courts, "while not bound to apply the guidelines, must consult those guidelines and take them into account when sentencing." *Booker*, 125 S.Ct. at 767 (internal quotation omitted).

Under *Booker's* remedial scheme, courts should follow the same procedures already employed under the guidelines, first resolving all disputes about the application of the guidelines in compliance with Fed. R. Crim. P. 32(I) and then determine the advisory guideline range.

Under 18 U.S.C. § 3553(a), the court must arrive at and "impose a sentence sufficient, but not greater than necessary, to comply with the purposes of sentencing set forth" here:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed–

    a. to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    b. to afford adequate deterrence to criminal conduct;

    c. to protect the public from further crimes of the defendant; and

    d. to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

(3) the kinds of sentences available;

(4) the sentencing range established through application of the sentencing guidelines and the types of sentences available under the guidelines;

(5) any pertinent policy statements by the Commission;

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

***Factors contained in USC § 3553(a) support Jesus Ernesto Dessens-Romero's request for a sentence of five years in prison.***

Jesus Ernesto Dessens-Romero (herein "Jesus") was born and raised in Agua Prieta, Sonora. His formative years were unmerciful and complicated with alcoholism, domestic violence, and poverty. His family lived in Colonia La Ladrillera, which is notorious for being an economically depressed area of the city. His family lived in a small block house that provided all their necessities such as running water, electricity, and an indoor kitchen and bathroom. Jesus' father, who was the principal breadwinner in the household, worked in construction. He built and installed windows in residential and commercial buildings around the city. Jesus' father was also a violent alcoholic. Jesus's father's addiction to alcohol left the family in ruins. On different occasions, law enforcement was called to the home to stop his father from physically abusing his mother, in plain sight of their children. As his father stayed out and drank, his family was left with nearly no funds to provide food, clothing, and medicine. Naturally, at a very young age, Jesus felt the need to start working. Jesus started working when he was about seven years old. At first, he washed cars for pocket change but as time progressed, relatively quickly, he was working as an assistant to an auto mechanic.

When Jesus was about ten years old, with the situation at his home being volatile, his mother sent Jesus to live with a neighbor's friend in the United States, with the intention of providing Jesus with an environment where he could focus on school and have a calm place to learn and mature. The reality was in stark contrast to Jesus' mother's expectations. Jesus was again deprived of the "normal" middle-school experience. To compensate the

family for his room and board, Jesus was made to work in the household. He was responsible for washing, drying, folding and putting away all of the family clothes, cleaning the kitchen and bathroom, mopping and keeping every room tidy, changing the linens, and whatever other job the family ordered him to complete. In this environment, Jesus was not able to associate with other schoolchildren, play sports, or study after school. By the end of the ninth grade, Jesus returned to Agua Prieta.

Jesus returned to find his family in the same situation as when he left. His father had left Agua Prieta for Guaymas, because his mother could no longer withstand his father's alcoholism and physical violence. At this time, his family's only source of support came from the few pesos his mother earned selling burritos, tortillas, and bread from her kitchen. Jesus did not return to school, instead, he immediately started working. Jesus worked every job possible to support his family. He painted and washed cars, and worked at auto garages and various restaurants around Agua Prieta.

As Jesus entered his mid-to-late teenage years, he was constantly working and staying out late. He also began to drink and use cocaine, which attracted the wrong crowd. When he was eighteen, he moved to Cananea, a small town further south of Agua Prieta. He again hoped for a different environment where he could abstain from drinking and using drugs. This did not happen. Instead, Jesus found himself unemployed and using even more substances. Eventually, Jesus moved back to Agua Prieta, working as an assemblyman in a brick factory.

In 2019, Jesus fell in love with his current partner, and they welcomed the birth of their first and only child who is currently three years old. Life again was not easy for Jesus

and his partner. The COVID pandemic devastated the small town of Agua Prieta. The few employment opportunities that previously existed totally evaporated. Feeling hopeless, the family made the decision to come to the United States. Entering illegally into the United States only complicated matters for Jesus and his family. He has not seen his partner or child since his arrest in Tennessee, which initiated the investigation involved in this case.

This Court has heard the evidence in this case and the jury has found Jesus guilty of several counts of trafficking and bringing in illegal aliens for profit. The death of a migrant is always tragic. The government, in their sentencing memorandum (Doc. 149), has put forth several aggravating factors; however, each factor should be considered alongside Jesus' conduct.

Jesus did not entice anyone to cross the border. The deceased and her family made lengthy arrangements and paid thousands of dollars to make yet another attempt to illegally enter the United States. Jesus played no role in these arrangements. When the deceased fell ill and started showing signs of fatigue, it was Jesus who picked her up and carried her. When she would throw and flail her body to the ground, Jesus was unrelenting, and he still managed to walk her closer to Fort Huachuca. He tried to give her as much water, Gatorade, and nutrients as possible. Never once did Jesus suggest abandoning the deceased in the desert; that decision was made by her sisters. Jesus respected their decision, leaving her in a location near a road adjacent to Fort Huachuca Army Base. The government's sentencing memorandum portrays Jesus as being completely selfish and lacking all compassion; however, Jesus was the only member of this group who provided the deceased with any meaningful assistance. Afterward, Jesus remained in contact with the deceased's family,

even though he did not have to. He provided the family with information on the deceased's last known whereabouts. When Jesus requested that the deceased's family remove a post looking for her, it was done with their safety in mind. Any unwanted attention brought upon cartels can be met with dangerous consequences, and Jesus was protecting the family and their identity by seeking to have them remove the Facebook post. Lastly, the government argues that the existence and mention of guns is an aggravating factor. The government points to a statement by a witness who explains that while he was in Mexico, a "bodyguard" possessed a weapon along with text messages wherein Jesus responds to a known person's interest in purchasing a firearm. It is complicated to assess Jesus' responsibility for the conduct of others, especially that of a "bodyguard" who played no role in the offense and for the conduct of other unknown people who were likely in a foreign country. Jesus' conduct was never threatening, and Jesus never possessed a gun or a weapon at any time in this case.

This case has made a significant impression on Jesus and has changed his outlook on life. He is deeply remorseful. He never sought to inflict harm, pain, or suffering on any person or family. He regrets his actions and hopes for peace upon the family of the deceased. When Jesus was arrested, he was still using alcohol and cocaine. He has been in prison for over two years. During that time, he has established his sobriety, which he intensely values, and he has reconnected with his Christian faith. He has reflected on his past behavior. Jesus seeks to be a mentor for other young men who find themselves in hopeless situations. When he returns to Agua Prieta, he hopes to offer his experiences as an example and guide others away from a life of addiction and criminal behavior.

Jesus Ernesto Dessens-Romero is before the Court for sentencing on his first felony conviction(s). He is requesting that the Court consider all the circumstances and evidence presented during the trial, where the jury found that he was not the proximate cause of the decedent's life. He hopes that the Court considers the kindness and compassion that he displayed towards the deceased and her family.

### Conclusion

For the reasons set forth herein and the factors contained in 18 U.S.C. § 3553(a), Jesus Ernesto Dessens-Romero respectfully requests that this Honorable Court impose a sentence of five years (sixty months) of prison.

RESPECTFULLY SUBMITTED this 26th of June 2024.

THE CARRILLO LAW FIRM, PLLC
F. MICHAEL CARRILLO

*s/ F. Michael Carrillo*
F. Michael Carrillo
*Attorney for Jesus Ernesto Dessens-Romero*

ISABEL MICHELA AMSEL

*s. Isabel M. Amsel*
Isabel A. Amsel
*Attorney for Jesus Ernesto Dessens-Romero*

Copy provided by ECF to:

Jared Kreamer Hope, Assistant US Attorney
United States Attorneys' Office

Heather N. Siegele, Assistant US Attorney
United States Attorney's Office